**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

Ysmael Maldonado,

*Plaintiff,*

v.

Corizon Health, Inc., Ruel Huffstead,
Dr. Frank Flores, Dr. Peter Wachtel, Dr. Raja
Sabbagh, Curt Walker, Lynn Devivo, Rose
Anim, Dr. Jean Richard, Ida Brown, Dr. Asha
Kumar, Dr. Maung Maungoo, Daniel Ashitey,
and Dr. Morsi Shaaban,

*Defendants.*

No. 15-cv-6619-PKC-LB

**AMENDED COMPLAINT**

## PRELIMINARY STATEMENT

1.    This is a civil rights action brought by Plaintiff Ysmael Maldonado due to the

unconstitutional and unlawful failure of the Defendants to provide him with adequate medical

care while he was in the custody of City of New York from December 3, 2014 until August 22,

2016. The Defendants were aware that he had serious medical needs due to a chronic skin

condition, and they had an obligation to provide adequate care for that condition. But for over a

year and a half they knowingly and manifestly failed to take his condition seriously. Defendants

completely ignored City regulations designed to ensure that chronic conditions like the one from

which Mr. Maldonado suffers are treated appropriately, and instead, Defendants chose only to

treat individual injuries as they developed, needlessly leaving Mr. Maldonado to suffer extreme

pain and additional physical injuries.

2.    Mr. Maldonado suffers from a chronic skin condition called hidradenitis, which

causes painful boils (or "abscesses") to develop regularly on his skin—in particular his

underarms. Each abscess swells over several days due to the accumulation of pus, making it

1

very painful, and needs to be drained and cared for by a medical professional to protect against infection. There is no known cure for hidradenitis, but there are several treatments available to alleviate the symptoms, including treatments to reduce the development of abscesses and protect against infections.

3. Many inmates in the City's custody suffer from chronic medical conditions, whether diabetes, asthma, or serious but rarer conditions like hidradenitis. Recognizing that such conditions require greater medical attention, the City has provided in its Health Care Minimum Standards regulations that a written treatment plan must be created for every inmate with a chronic condition and included in the inmate's medical file. This treatment plan is designed to ensure that the particular needs of inmates with chronic medical conditions are properly met, whether in the form of proper oversight as to various courses of treatment, ready access to medical clinics, or anything else reasonably required to treat the particular condition.

4. A treatment plan for a condition like hidradenitis should, among other things, ensure that the inmate has regular access to medical professionals to drain abscess and keep them clean and free from infections as the wounds heal. It should also ensure that appropriate treatment options are considered and, where appropriate, made available in a timely manner to prevent abscesses and infections, and to alleviate the pain and discomfort that come along with the condition. And it should provide that specific doctors oversee the long-term treatment of the condition.

5. No such plan was ever created for Mr. Maldonado. That simple omission could easily have been corrected at any time, but instead it marked the first of Defendants' many failures in providing appropriate care for Mr. Maldonado's chronic skin condition.

2

6.     All but two of the Defendants are individual medical professionals who treated

Mr. Maldonado while he was in the City's custody. All of them knew of his serious and chronic

hidradenitis, and in addition to failing to ensure that a written treatment plan was created, all of

them failed to provide proper treatment for his underlying chronic condition. Instead, they

pursued the easier but needlessly riskier and more painful path of only treating individual

abscesses after they develop. While their visits with Mr. Maldonado were not regular—which is

part of the problem with the failure to create a written treatment plan—among the many

problems with Mr. Maldonado's care are the following:

a.     When he needed to visit the clinic in his housing unit, numerous Defendants
regularly sent him back to his dormitory without treating him. Mr. Maldonado
was instead left to drain his abscesses himself.

b.     When he was referred to a specialist, he could not have that appointment for
almost four months due to repeated cancellations and delays. Specifically, a visit
with a surgical specialist was cancelled and rescheduled at least nine times in
early 2015, and numerous Defendants allowed this to happen, leaving
Mr. Maldonado to continue to develop painful abscesses in the meantime.

c.     When a surgical specialist recommended a topical lotion to *prevent* infections in
June 2015, numerous Defendants failed to ensure that he received the lotion in a
timely manner. He did not receive it until late 2015, and was forced to endure
additional abscesses—including at least one that developed a bacterial infection—
as well as pain and discomfort.

d.     When that same surgical specialist recommended in June of 2015 that
Mr. Maldonado be seen by a dermatologist for further management of his
condition, numerous Defendants did not ensure that he was seen in a timely
manner. The appointment was scheduled for February 2016—over eight months
away—and these Defendants allowed those eight months to pass without concern.

e.     When Mr. Maldonado eventually *did* see the dermatologist, he was given
injections (once in February and again about a month later) that provided
temporary relief from his abscesses, but that was the last relief he had while at
Rikers Island. There was no management of his condition or oversight of his
treatment by any of the Defendants. Those working in his housing unit still did
not ensure that he could access the clinic when needed.

f.     Finally, when Mr. Maldonado needed and asked for gauze and other supplies to
care for his wounds in his dormitory, numerous Defendants refused his requests.

3

By the end of his time at Rikers Island, he had reused the same five pads of gauze—soaked in pus and blood, washed in his sink, and then left to dry—over and over for more than three months.

7.     All of this could have been avoided if just one of the Defendants had taken the time to ensure that a written treatment plan was created for his care. None did. And to top it all off, they consciously chose not to communicate effectively with Mr. Maldonado even when they did see him. Mr. Maldonado speaks Spanish, but the individual Defendants failed to use an interpreter when meeting with him, despite the fact that an interpreter was readily available. This meant that the individual Defendants could not receive complete and accurate information about his condition and that he was left in the dark about his condition and how to care for it.

8.     Defendant Corizon Health, Inc. ("Corizon") was responsible for providing medical care for inmates in the City's custody up until December 31, 2015, when the City decided not to renew its contract due to Corizon's long record of providing insufficient care and oversight of its employees. Defendant Huffstead was an administrator and policymaker for Corizon at Rikers Island while this conduct was occurring. Both have been well aware of unconstitutionally inadequate medical care provided for inmates with chronic conditions at Rikers Island over the last several years, several of which led to inmate deaths that, in turn, received great attention from state investigators, the New York City government, and national press. Defendant Huffstead was even personally involved in Mr. Maldonado's care and was aware of his serious medical condition and the long delays in his treatment, but failed to do anything about it. Defendants' tolerance of and indifference to these failures constitutes a custom, policy, and practice of allowing unconstitutional conduct to continue, and they too have caused Mr. Maldonado to suffer needlessly from inadequate medical care.

4

9.	In short, Mr. Maldonado's experience at Rikers Island is a case study in how **not** to provide care for an individual with a chronic condition. This Amended Complaint seeks damages for the needless physical injuries, pain, and suffering Defendants have caused.

## PARTIES

10.	Plaintiff Ysmael Maldonado is an inmate currently in the custody of the State of New York.

11.	Defendant Corizon Health, Inc. provided medical services to prisoners in the custody of the City of New York, including at the Manhattan Detention Center and on Rikers Island in 2014 and 2015, until its contract with the City of New York ended on December 31, 2015. In carrying out its duties, Corizon was required to ensure that the personnel it employed complied with all relevant federal, state, and local laws, regulations, and policies.

12.	Defendant Ruel Huffstead was an administrator and a policymaker working for Corizon on Rikers Island through December 31, 2015. Defendant Huffstead was responsible for the training, supervision, implementation, and conduct of Corizon employees providing medical care on Rikers Island. Defendant Huffstead is sued in his official and individual capacities.

13.	On information and belief, at all times relevant hereto Defendant Dr. Frank Flores was a physician who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Flores is sued in his individual capacity.

14.	On information and belief, at all times relevant hereto Defendant Dr. Peter Wachtel was a physician who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Wachtel is sued in his individual capacity.

15.     On information and belief, at all times relevant hereto Defendant Dr. Raja Sabbagh was a physician who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Sabbagh is sued in his individual capacity.

16.     On information and belief, at all times relevant hereto Defendant Curt Walker was a physician's assistant who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Walker is sued in his individual capacity.

17.     On information and belief, at all times relevant hereto Defendant Lynn Devivo was a physician's assistant who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Devivo is sued in her individual capacity.

18.     On information and belief, at all times relevant hereto Defendant Rose Anim was a registered physician's assistant who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Anim is sued in her individual capacity.

19.     On information and belief, at all times relevant hereto Defendant Dr. Jean Richard was a physician who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Richard is sued in her individual capacity.

20.     On information and belief, at all times relevant hereto Defendant Ida Brown was a physician's assistant who provided medical care on Rikers Island, and until at least

December 31, 2015 was an employee of Defendant Corizon. Defendant Brown is sued in her individual capacity.

21.     On information and belief, at all times relevant hereto Defendant Dr. Asha Kumar was a physician who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Kumar is sued in her individual capacity.

22.     On information and belief, at all times relevant hereto Defendant Dr. Maung Maungoo was a physician who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Maungoo is sued in his individual capacity.

23.     On information and belief, at all times relevant hereto Defendant Daniel Ashitey was a physician's assistant who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Ashitey is sued in his individual capacity.

24.     On information and belief, at all times relevant hereto Defendant Dr. Morsi Shaaban was a physician who provided medical care on Rikers Island, and until at least December 31, 2015 was an employee of Defendant Corizon. Defendant Shaaban is sued in his individual capacity.

## JURISDICTION AND VENUE

25.     This action arises under the Eighth and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. §§ 1983 and 1988 and New York state law.

26.     The jurisdiction of this Court is based on 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

### Regulations and Policies of the City of New York

28.     The City of New York has issued Health Care Minimum Standards regulations, which establish minimum standards for the provision of medical care in city jails, including for inmates with chronic conditions. One of the purposes of these minimum standards is to ensure that inmates with chronic conditions will be provided with proper medical care while in the custody of the City.

29.     The Health Care Minimum Standards regulations set out several requirements specifically targeted to inmates with "special needs," which include inmates with chronic conditions.

30.     Specifically, a written treatment plan, developed by the health care provider, supervised by medical personnel, must exist for each special needs inmate and must be included in the health record, and it may include, among other things, instructions about the type and frequency of laboratory and diagnostic testing, and the frequency of follow-up for medical evaluation and adjustment of treatment methods. Rules of the City of New York, Title 40, Ch. 3, § 3-02(h).

31.     The Health Care Minimum Standards regulations also require the following, among other things:

a.     Correctional personnel shall never prohibit, delay, or cause to prohibit or delay an inmate's access to care or appropriate treatment. All decisions regarding the need for medical attention shall be made by health care personnel.

b.     Staffing levels in jail clinics shall be adequate in numbers and types to insure that sufficient care is provided.

8

c.      Outpatient specialist services shall be provided to inmates in time frames specified by the referring medical personnel upon the written determination of a physician that the treatment appropriate to the inmate's health care need is not available in the correctional facility or cannot adequately be provided at such facility. In the event that the inmate has previously been treated by the specialty clinic physician, the specialty clinic physician shall determine the medically appropriate time for the return visit(s).

d.      Correctional or health care personnel shall not deny or unreasonably delay, or cause to deny or unreasonably delay an inmate's access to specialty services at any outpatient clinic.

32.     The New York City Department of Corrections has a Language Access Plan which seeks to ensure that inmates who speak Spanish and other languages can effectively communicate with the Department in all ways necessary to ensure their safety, health and well-being while in custody. With respect to medical care, the Language Access Plan states that the organizations providing medical care in City jails use a dial-up interpretation service, which can be utilized through dual headset headphones or speakerphones, to provide interpretation of inmate medical information. Interpreters are therefore available for medical encounters between medical employees who speak English and inmates such as Mr. Maldonado who speak Spanish.

## Defendants' Initial Treatment of
## Mr. Maldonado at the Manhattan Detention Center

33.     In late 2014, Mr. Maldonado was arrested for drug possession and taken into the custody of the City of New York.

34.     Mr. Maldonado is from the Dominican Republic and speaks Spanish. His ability to understand English is limited. In particular, he is unable to communicate any medical information in English.

35.     Mr. Maldonado was first housed at the Manhattan Detention Center, where he was given an initial intake examination by Dr. Charles Appiah on December 3, 2014. In this examination, Dr. Appiah observed that Mr. Maldonado had a wound in his right underarm—or

9

"axilla"—due to a chronic skin condition called hidradenitis. (Because "axilla" is the medical terms used throughout Mr. Maldonado's medical file to refer to his underarm, that is the term used here.)

36.    Hidradenitis is a serious and chronic skin condition that causes abscesses to develop regularly on the skin, typically in areas of the body where skin is touching skin—for example, the axillae and the groin. As the abscesses grow, they become filled with pus, which makes them hard to the touch. The abscesses are also extremely painful and can interfere with the normal activities of daily life, including basic movement of the arms and sleeping. They need to be drained by a medical professional; if left untreated, eventually an abscess will break open, allowing the foul-smelling pus to drain out. Each individual abscess presents a risk of infection.

37.    Over time, as more abscesses come and go, areas of the skin most affected by the abscesses can become scarred and sensitive to the touch. Tunnel-like connections called sinus tracts can also develop through the heavily scarred areas. In rare cases, these sinus tracts can lead to the development of squamous cell carcinoma, a serious form of skin cancer.

38.    Proper care for individual abscesses calls for a medical professional to make an incision in the abscess allowing it to drain. This incision and drainage procedure, commonly called an "I&D," requires several follow-up visits in order to ensure that the wound heals safely. After an I&D, each abscess will typically continue to generate pus for several days. If the incision point is allowed to heal while pus is still being created, the abscess will not go away. It also presents a risk of infection because any bacteria that gets in the wound before it heals will be able to grow in the lingering abscess. As a result, to properly care for an abscess after the initial I&D, it must be allowed to continue draining over several days, while taking care to ensure that

the still-open wound is kept clean so that it does not become infected. This is typically done by packing the abscess with clean gauze after the initial I&D procedure, with a small portion of the gauze being left to protrude through the incision point so that the wound does not close. After that the gauze should be removed and replaced every day or so until pus is no longer generated. Once that occurs—and as long as no other signs of lingering problems are present—the wound can be allowed to heal.

39.     There is no known cure for hidradenitis. The I&D procedure is only a method of addressing abscesses after they occur; it does not prevent abscesses from developing in the future, slow the development of the condition, decrease its symptoms, or otherwise address the various ways in which the condition repeatedly manifests itself.

40.     Several treatments for hidradenitis exist, and they can alleviate some of the symptoms of hidradenitis. For example, a topical lotion called clindamycin is commonly used to prevent bacterial infections in abscesses. An injection of kenalog can assist with the healing of abscesses by reducing inflammation, thereby providing temporary relief. Areas of the skin where abscesses occur frequently can also be excised (along with nearby glands) and thereby prevent the future development of abscesses in those areas.

41.     Hidradenitis is a chronic condition requiring "chronic care," as that term is used in the Minimum Health Care Standards regulations.

42.     Two days after his initial intake examination, on December 5, 2014, Mr. Maldonado was seen at the clinic in the Manhattan Detention Center because the abscess in his right axilla was causing pain and draining pus. This wound continued to need medical care over the next week. It was extremely painful and interfered with his movement.

43.     By January 2, 2015, Mr. Maldonado had developed an abscess in his left axilla and one on the right side of his groin.  Each abscess was extremely painful and interfered with his movement.  He was seen by Defendant Dr. Frank Flores, who examined his wounds and performed an I&D to drain the abscess in the left axilla.

44.     On January 3, 2015, Mr. Maldonado was seen by Defendant Dr. Peter Wachtel, who examined and cleaned his wounds.

45.     Neither Defendant Flores nor Defendant Wachtel gave Mr. Maldonado any medication for his pain.

46.     Despite being aware of Mr. Maldonado's chronic condition, including his pain and suffering from recurrent abscesses, Defendants Flores and Wachtel exhibited deliberate indifference to his chronic medical condition, pain, and suffering.  Among other things, they did not:

   a.     give Mr. Maldonado any medication for his pain;

   b.     provide Mr. Maldonado with any treatment designed to address the underlying condition, such as clindamycin or kenalog injections, rather than merely treating abscesses after they occur;

   c.     use an interpreter when interacting with Mr. Maldonado to be fully informed of his condition and to provide him with medical advice and instruction, despite the existence of the Language Access Plan and the availability of interpreters; or

   d.     ensure that Mr. Maldonado had a written treatment plan to ensure proper care for his hidradenitis.

**Defendants' Delay and Denial of Treatment at the George Motchan
Detention Center and the West Facility Surgery Center in the First Half of 2015**

47.     In mid-January, Mr. Maldonado was transferred to the George Motchan Detention Center at Rikers Island.  By that point, the abscess in his left axilla had become infected.  Mr. Maldonado experienced severe pain, with foul-smelling pus and blood being discharged from the wound.

48. On February 3, 2015, Mr. Maldonado was seen at the West Facility Surgery center by Defendant Dr. Raja Sabbagh. Defendant Sabbagh drained the left axilla and called for a follow-up appointment in two weeks.

49. By February 5, 2015, the wound in Mr. Maldonado's left axilla was still discharging blood.

50. While Mr. Maldonado was supposed to have a follow-up appointment at the West Facility Surgery center two weeks after his February 3 appointment, due to the improper actions of numerous Defendants, described below, he did not have that follow-up visit for over three months—until late May of 2015. Numerous appointments were cancelled between February and May 2015.

51. In particular, appointments were scheduled for each of the following dates, and Mr. Maldonado was not produced for a single one; each appointment was rescheduled: February 17, 2015; February 24, 2015; March 3, 2015; March 10, 2015; March 17, 2015; March 31, 2015; April 7, 2015; April 21, 2015; and May 5, 2015.

52. Defendant Sabbagh and Defendant Curt Walker worked at the West Facility Surgery center at this time and were aware that these appointments were regularly and repeatedly being cancelled and rescheduled, but did not ensure that Mr. Maldonado was produced for any of his appointments with the West Facility Surgery center at this time.

53. Defendant Ruel Huffstead was an administrator and policymaker for Defendant Corizon Health, Inc. His responsibilities included forming policy for the provision of medical care at Rikers Island, as well as supervising, scheduling, and coordinating specialty clinic services for inmates at Rikers Island, and ensuring that all Rikers Island inmates being scheduled for services are seen within appropriate timeframes. Defendant Huffstead was aware of

Mr. Maldonado's chronic medical condition and the history of his visits while in the custody of the City of New York. He was also aware that these appointments were regularly and repeatedly being cancelled and rescheduled, but he did not ensure that Mr. Maldonado was produced for any of his appointments with the West Facility Surgery center at this time.

54.     Defendant Lynn Devivo, Defendant Rose Anim, and Defendant Dr. Jean Richard worked at the George Motchan Detention Center and were aware that these appointments were regularly and repeatedly being cancelled and rescheduled, but they did not ensure that Mr. Maldonado was produced for any of his appointments with the West Facility Surgery center at this time.

55.     During this period, Mr. Maldonado continued to experience painful abscesses, which interfered with his daily activities. At some point while his appointments at the West Facility Surgery center were being cancelled and rescheduled, Mr. Maldonado developed a severe and extremely painful abscess in one of his axillae. It grew so large it was the diameter of a baseball and began extending across his chest. Mr. Maldonado was not able to be seen at the clinic for over a week, and when he was finally able to go it was too late. On the way to the clinic, the abscess burst open, causing foul-smelling pus and blood to soak Mr. Maldonado's shirt. This was extremely painful.

56.     The wound continued to bleed and drain foul-smelling pus for approximately a month. This was also extremely painful, limited Mr. Maldonado's daily activities and movements, and put Mr. Maldonado at an increased risk of infection.

57.     Mr. Maldonado was transferred away from the George Motchan Detention Center in mid-May 2015, without having had the recommended follow-up visit to the West Facility Surgery center after his February 3, 2015 visit.

14

58.     Despite being aware of Mr. Maldonado's chronic condition, including his pain

and suffering from recurrent abscesses, Defendants Sabbagh, Walker, Huffstead, Devivo, Anim,

and Richard exhibited deliberate indifference to his chronic medical condition, pain, and

suffering. Among other things, they did not:

a.      ensure that Mr. Maldonado had a follow-up appointment with the West Facility
        Surgery center in a timely manner;

b.      provide Mr. Maldonado with any treatment designed to address the underlying
        condition, such as clindamycin or kenalog injections, rather than merely treating
        abscesses after they occur;

c.      use an interpreter when interacting with Mr. Maldonado to be fully informed of
        his condition and to provide him with medical advice and instruction, despite the
        existence of the Language Access Plan and the availability of interpreters; or

d.      ensure that Mr. Maldonado had a written treatment plan to ensure proper care for
        his hidradenitis.

### Defendants' Delay and Denial of Treatment at the Robert N. Davoren Center and the West Facility Surgery Center in the Second Half of 2015

59.     After leaving the George Motchan Detention Center, Mr. Maldonado was housed

at the Robert N. Davoren Center ("RNDC") for the rest of his time at Rikers Island.

60.     Mr. Maldonado had an appointment with the RNDC clinic on May 17, 2015, but

he was not produced to the clinic for this appointment.

61.     Mr. Maldonado found that the clinic in the RNDC housing unit was regularly

overflowing with patients needing care. The waiting room was approximately 10 feet by 6 feet,

and as many as 30 inmates needing care were frequently waiting in that room. On numerous

occasions, Mr. Maldonado visited the clinic and waited in the waiting room, but was not seen

and was instead taken back to his dormitory.

62.     Defendant Ida Brown, Defendant Dr. Asha Kumar, Defendant Dr. Maung

Maungoo, Defendant Daniel Ashitey, and Defendant Dr. Morsi Shaaban worked in the RNDC

15

clinic at this time and denied Mr. Maldonado care due to this overcrowding. This happened approximately six times during his time at the RNDC housing unit.

63. As a result of the regular inability to access the clinic, in the summer of 2015 Mr. Maldonado began to drain some of his abscesses in his dormitory by himself by squeezing the abscesses. This exposed Mr. Maldonado to an even greater risk of infection, as it could cause the pus and any bacteria in the abscess to be pressed deeper into his flesh or spread further around the affected area. It could also facilitate the entry of new bacteria into the wound.

64. On May 26, 2015, Mr. Maldonado finally had a follow-up visit with Defendant Sabbagh at the West Facility Surgery center. By that point, he had multiple areas in his left axilla draining foul-smelling pus, along with extensive scarring showing chronicity. Defendant Sabbagh recommended that Mr. Maldonado be seen at the Bellevue Surgery center in Manhattan. An appointment with the Bellevue Surgery center was scheduled for *August 17, 2016—well over a year away.*

65. Nearly two weeks later, the wound in Mr. Maldonado's left axilla was still draining pus and he was still experiencing severe pain. As a result, Mr. Maldonado's appointment with Bellevue Surgery was moved up to June 17, 2015.

66. By the time Mr. Maldonado went to the Bellevue Surgery center on June 17, the abscess in his left axilla that was seen by Dr. Sabbagh had continued to cause pain and drain foul-smelling pus for several weeks. He also had new abscesses in his right axilla and his left groin.

67. At the Bellevue Surgery center, the surgical specialist provided to evaluate Mr. Maldonado was a fourth-year medical student. The report for this visit states that English

16

was used in the examination. Interpreters were available for this appointment, but they were not used.

68. The student at Bellevue Surgery recommended that Mr. Maldonado be given a topical lotion called clindamycin, which as noted above is a common treatment for hidradenitis that is used to prevent bacterial infections in abscesses.

69. This was the first time that anyone treating Mr. Maldonado recommended that he be given a treatment that would prevent pain, suffering, and infections before they occur, rather than pursuing the easier but needlessly riskier and more painful route of only treating abscesses after they develop.

70. Yet despite this recommendation, numerous Defendants, noted below, failed to provide Mr. Maldonado with clindamycin for months—he did not receive clindamycin until late 2015.

71. The student at Bellevue Surgery also recommended that Mr. Maldonado be seen by a dermatologist for further management.

72. This was the first time that anyone treating Mr. Maldonado recommended that he be seen by a dermatologist.

73. Yet despite this recommendation, an appointment with a dermatologist at the Bellevue Dermatology center was set for February 23, 2016—over eight months later—and not one of numerous Defendants, noted below, made sure that he visited a dermatologist sooner, in a timely manner.

74. After this visit to Bellevue Surgery, Mr. Maldonado continued to develop painful abscesses in his axillae that required draining and further care. He complained to Defendant Brown in late June that he had not received the clindamycin he was prescribed to prevent

bacterial infections and abscesses. When he still did not get the clindamycin by early August, he repeated his complaint to Defendant Kumar on August 7, 2015 and to Defendant Maungoo on August 10, 2015.

75. By early September, Mr. Maldonado still had not received clindamycin, and he had developed a new abscess in his right axilla that was oozing pus.

76. He was seen at the RNDC clinic on September 10, 2015, by Defendant Ashitey, who sent him to the West Facility Surgery center, where he was seen again by Defendant Flores, whom he had seen in January 2015. Defendant Flores performed an I&D on the wound in Mr. Maldonado's right axilla, draining the pus that had accumulated. He also sent a sample of the wound for testing.

77. Mr. Maldonado then had follow-up visits with Defendants Kumar and Wachtel over the next week. (As noted above, Defendant Wachtel had also seen Mr. Maldonado in January 2015.)

78. On September 15, 2015, the wound sample taken on September 10 showed the growth of several types of bacteria. Among other things, a certain type of staphylococcus bacteria was found.

79. By mid-October, Mr. Maldonado had more painful abscesses and he still had not received the clindamycin he had been prescribed back in June. He visited the clinic and the pharmacy multiple times, to no avail; he also complained about the lack of clindamycin to Defendant Brown, to whom he had already complained in late June.

80. He ultimately received the clindamycin near the end of 2015.

81. He was not informed of the fact that clindamycin is intended to prevent bacterial infections.

82.     Despite being aware of Mr. Maldonado's chronic condition, including his pain

and suffering from recurrent abscesses, his February 23, 2016 dermatology appointment, and his

need for clindamycin, Defendants Brown, Kumar, Maungoo, Ashitey, and Shaaban exhibited

deliberate indifference to his chronic medical condition, pain, and suffering, as did Defendants

Flores and Wachtel, who had previously treated him in January 2015.  Among other things, they

did not:

a.      ensure that Mr. Maldonado had regular and easy access to the RNDC clinic and
        other medical facilities;

b.      ensure that Mr. Maldonado had an appointment with a dermatologist in a timely
        manner, including by rescheduling the appointment with the Bellevue
        Dermatology clinic to an appropriate and timely date;

c.      ensure that Mr. Maldonado received clindamycin in a timely manner;

d.      provide Mr. Maldonado with any other treatment designed to address the
        underlying condition, such as kenalog injections, rather than merely treating
        abscesses after they occur;

e.      use an interpreter when interacting with Mr. Maldonado to be fully informed of
        his condition and to provide him with medical advice and instruction, despite the
        existence of the Language Access Plan and the availability of interpreters; or

f.      ensure that Mr. Maldonado had a written treatment plan to ensure proper care for
        his hidradenitis.

### Defendants' Delay and Denial of Treatment
### at the Robert N. Davoren Center in 2016

83.     By early 2016, Mr. Maldonado was still experiencing painful abscesses in his left

and right axillae.  Because the RNDC clinic did not provide him help, he continued to drain his

abscesses in his dormitory by himself.

84.     On February 23, 2016, Mr. Maldonado had the appointment at the Bellevue

Dermatology center that had been scheduled over eight months earlier.  The report for this visit

states that English was used in the examination. Interpreters were available for this appointment, but they were not used.

85.    The medical resident who saw Mr. Maldonado gave him an injection of kenalog in his left axilla to assist with the healing of abscesses and provide temporary relief. She also prescribed additional clindamycin and an additional topical gel to prevent the development of bacterial resistance to antibiotics. About a month later, Mr. Maldonado returned to the Bellevue Dermatology center, where he received an injection of kenalog in both his left and right axillae.

86.    These kenalog injections reduced Mr. Maldonado's discomfort for about six weeks. They were the last treatment Mr. Maldonado received that provided relief.

87.    Mr. Maldonado began experiencing lesions again by late spring of 2016, but he was not provided with additional kenalog or topical treatments again for the rest of his time at Rikers Island. Nor was he sent back to the Bellevue Dermatology center. Nor for that matter did the clinic in the RNDC housing unit regularly treat him for his wounds. Instead, throughout the summer of 2016, as Mr. Maldonado continued to experience abscesses, he was not able to regularly access the RNDC clinic.

88.    In particular, on information and belief, Defendants Brown, Maungoo, Kumar, Ashitey, and Shaaban turned him away from the RNDC clinic.

89.    Upon one arrival at the clinic, Mr. Maldonado was greeted by one of these Defendants, who stated "You again?" He sat in the waiting room while over a dozen patients were treated before him, and then about 15 more patients who came in after him were treated as well. Eventually, he was sent home without being treated.

90.    Mr. Maldonado was therefore forced to continue to drain his abscesses in his dormitory by himself.

20

91.     Throughout his time at the RNDC housing unit, Defendants Brown, Maungoo, Kumar, Ashitey, and Shaaban did not provide Mr. Maldonado with clean gauze and other supplies to use when he needed to care for his wounds in his dormitory. Mr. Maldonado asked these Defendants for more gauze on numerous occasions, but they did not give him any. This forced Mr. Maldonado to save and then reuse the gauze from the bandages that were applied to his wounds.

92.     For example, because Mr. Maldonado could not be seen at the clinic during the summer of 2016, he had just five pads of gauze to use to treat himself that entire summer. When he developed a new abscess, he would stack his five pads of gauze on top of each other and use them to soak up the pus and blood that drained from the wound. Once the abscess healed, he would take the gauze—by that point saturated with both wet and dry pus and blood—and he would do his best to wash them in the sink in his dormitory. He would then set them out to dry. When his next abscess appeared, he would use the gauze again. This presented a great risk of infection. It continued until the day he left Rikers Island on August 22, 2016.

93.     By the time he left Rikers Island, Mr. Maldonado had endured numerous I&D procedures; he had drained numerous other abscesses himself; numerous appointments with a surgical specialist had been cancelled by Defendants; Defendants had denied him treatment at the clinic numerous times and forced him to re-use the same five pads of gauze over and over again for more than three months; and he had developed at least one infection and extensive scarring in his right and left axillae. And during all of this—for over a year and a half—he experienced severe pain with each abscess, trouble sleeping, and difficulty moving around during the day.

94.     Despite being aware of Mr. Maldonado's chronic condition, including his pain

and suffering from recurrent abscesses, Defendants Brown, Maungoo, Kumar, Ashitey, and

Shaaban exhibited deliberate indifference to his chronic medical condition, pain, and suffering.

Among other things, they did not:

a.     ensure that Mr. Maldonado had regular and easy access to the RNDC clinic and
       other medical facilities;

b.     ensure that Mr. Maldonado had sufficient gauze and other supplies necessary to
       properly care for his wounds when he could not be seen by a medical clinic;

c.     provide Mr. Maldonado with any additional treatment designed to address the
       underlying condition, such as additional clindamycin or kenalog injections, rather
       than merely treating abscesses after they occur;

d.     use an interpreter when interacting with Mr. Maldonado to be fully informed of
       his condition and to provide him with medical advice and instruction, despite the
       existence of the Language Access Plan and the availability of interpreters; or

e.     ensure that Mr. Maldonado had a written treatment plan to ensure proper care for
       his hidradenitis.

### A Custom, Policy, and Practice of Abuse and Neglect, and a Failure to Train and Supervise

95.     Corizon has been aware for years that inmates with chronic medical conditions

have special medical needs. Among other things, such inmates require regular, prompt, and easy

access to medical clinics, treatment, and, where appropriate, specialists. Corizon has also known

that staffing levels in jail clinics must be sufficient to provide adequate care for inmates with

special needs and chronic conditions.

96.     In 1991, the New York City Board of Correction issued the Health Care

Minimum Standards regulations. As noted above, these regulations establish minimum

standards for the provision of medical care in city jails, including for inmates with special needs

and chronic conditions.

97. As noted above, Defendant Huffstead was and is an administrator and policymaker for Defendant Corizon Health, Inc. Defendant Huffstead was aware of Mr. Maldonado's chronic medical condition and his history of repeated abscesses and repeated cancelled medical appointments. Defendant Huffstead's responsibilities also include ensuring compliance by Corizon staff at Rikers Island with all policies and procedures.

98. Over the last several years, Corizon and Defendant Huffstead have been aware of serious departures from and breaches of the Health Care Minimum Standards regulations, amounting to deliberate indifference to the medical needs of inmates, and they have knowingly failed to ensure that these procedures have been followed, including with respect to inmates with chronic conditions such as hidradenitis.

99. In March 2015, the New York City Council held hearings on the quality of medical care provided to inmates in City custody by Defendant Corizon. Among other things, a Committee Report noted numerous failures of Defendant Corizon in providing medical care to inmates over the previous several years. These included several deaths of inmates due to the failure to treat chronic diseases such as diabetes. Other inmates suffered from asthma, also a chronic condition, without receiving treatment. Inmates with serious medical needs were also acknowledged to have been turned away from medical clinics because of overcrowding, resulting in at least one death. And in one case, an inmate with a torn artery was diagnosed with a different problem at least nine times, when further testing could have revealed the torn artery; the inmate died from the torn artery before it was identified. These events were widely reported in the press.

100. These are not mere isolated incidents. The Committee Report acknowledged that despite the mandated staffing, training, and performance requirements placed upon Defendant

Corizon, its staff have reported severe deficiencies in the provision of medical care. In 2013, the New York Times reported that out of 65,000 planned inmate medical visits, 47% had to be rescheduled. This data came from the union that represents doctors at City jails. The Committee Report also acknowledged that there is a high rate of chronic conditions in City jails.

101.    The Committee Report also noted that several investigations had been conducted into Defendant Corizon's provision of care in City jails that led to injuries and deaths. One investigation by the New York State Commission of Correction ("SCOC") reviewed the death of a mentally ill inmate who died in solitary confinement at Rikers Island in 2013 after being denied access to required medical and psychiatric care. The SCOC report found that Defendant Corizon was directly implicated in this inmate's death, concluding that if the inmate had been provided with adequate care by Defendant Corizon in prison, his death could have been avoided, and the care that was provided was so incompetent as to shock the conscience. The SCOC report recommended, among other things, that the City of New York should consider whether Corizon is fit to continue providing medical and mental health care in City jails in light of its delivery of flagrantly inadequate, substandard, and dangerous care to this inmate.

102.    In a federal lawsuit filed against Corizon regarding this death, the City of New York withdrew from defending Corizon. *See Griffin, et al. v. City of New York, et al.*, No. 14-cv-7329, Dkt. 25 (S.D.N.Y. July 14, 2015).

103.    In May 2015, the New York City Council issued another Committee Report repeating these same findings.

104.    In June 2015, the City decided not to renew its contract with Defendant Corizon when it expired on December 31, 2015, and to take over care at city jails itself. Even after June 2015, Defendant Corizon continued to be aware of serious inadequacies in the medical care

being provided to inmates, including inmates with chronic conditions such as hidradenitis. Overcrowding in clinics at Rikers Island continued to be a problem, to the point where the clinics could not treat every inmate needing medical attention and instead had to turn them away. Inmates with chronic conditions were not provided with written treatment plans and encountered difficulty obtaining required medications.

105. In sum, Defendant Corizon and Defendant Huffstead knew that unconstitutionally inadequate medical care was being provided by medical staff to inmates, including inmates with chronic conditions, and they allowed it to continue.

106. Further, the unconstitutionally inadequate medical care that was being provided by medical staff to inmates, including inmates with chronic conditions, was so widespread that Defendant Corizon and Defendant Huffstead must have been aware that the violations were occurring and must have tolerated them.

107. Defendant Corizon and Defendant Huffstead further failed to adequately train and supervise their employees with respect to the medical needs of inmates in their custody.

108. Because it is a city jail, and not a state prison, inmates who are sentenced to a term of imprisonment beyond a year will be at Rikers Island only temporarily; they will serve the bulk of their sentence in the custody of New York State. This creates an incentive for medical employees at Rikers Island to provide only very basic treatments to inmates, rather than to address their medical needs adequately. For example, with respect to inmates with chronic conditions, medical employees at Rikers Island have an incentive to provide only "easy" treatments designed to stave off a severe deterioration in the inmate's condition while in the City's custody; medical employees at Rikers Island have little incentive to create a written treatment plan designed to provide long-term comprehensive care for the inmate's chronic

25

condition. Medical employees at Rikers Island also have an incentive to delay costly treatment so that the cost will be borne by the state. In short, medical employees at Rikers Island have a strong incentive to provide only "stop gap" measures, leaving it to New York State to deal with inmates' chronic conditions.

109.     Defendant Corizon and Defendant Huffstead were aware that medical employees at Rikers Island confront this situation and that it presents the medical employees with a difficult choice of a sort that additional training or supervision will make less difficult. In particular, additional training on and supervision of the creation and application of written treatment plans for inmates with chronic conditions will reduce the risk that medical employees at Rikers Island decide not to create or follow written treatment plans for inmates with chronic conditions. Defendant Corizon and Defendant Huffstead were also aware of a history of medical employees providing unconstitutionally inadequate medical care to inmates housed at Rikers Island, including those with chronic conditions, as described above. Finally, both the failure to create and implement written treatment plans, and the failure to provide the breadth and quality of treatment that is required for inmates with chronic conditions more generally, will frequently lead to unconstitutionally inadequate medical care, including delays in treatment, insufficient access to medicine, insufficient monitoring of the inmate's condition, and more.

110.     Despite being aware of Mr. Maldonado's chronic condition, including his pain and suffering from recurrent abscesses, and of Corizon employees' unconstitutional actions, described above, Defendant Corizon and Defendant Huffstead exhibited deliberate indifference to Mr. Maldonado's chronic medical condition, pain, and suffering through a custom, policy and practice. Among other things, they did not:

    a.     ensure that Mr. Maldonado had regular and easy access to the RNDC clinic and other medical facilities;

26

b.      ensure that Mr. Maldonado had scheduled follow-up appointments and appointments with specialists in a timely manner;

c.      ensure that Mr. Maldonado had sufficient gauze and other supplies necessary to properly care for his wounds when he could not be seen by a medical clinic;

d.      ensure that Mr. Maldonado was provided with additional treatment designed to address the underlying condition, such as additional clindamycin or kenalog injections, rather than merely treating abscesses after they occur;

e.      ensure that an interpreter was used when Corizon employees interacted with Mr. Maldonado so that they would be fully informed of his condition and would provide him with medical advice and instruction, despite the existence of the Language Access Plan and the availability of interpreters; or

f.      ensure that Mr. Maldonado had a written treatment plan to ensure proper care for his hidradenitis.

### Plaintiff's Notice of Claim

111.    While the City of New York is not a defendant in this action, it may have an obligation to indemnify some of the Defendants. The City has had actual notice of the facts on which Mr. Maldonado's claims are based since the original pro se complaint in this action was filed on November 17, 2015. The City has also acted on that notice by retaining outside counsel, who appeared in this action and, on January 26, 2016, sought leave to file a motion to dismiss Mr. Maldonado's claims.

112.    At no point since the initial complaint was filed has the City offered to resolve Mr. Maldonado's claims.

113.    A written notice of claim was served on the City of New York earlier today.

114.    This Amended Complaint has been filed within one year and ninety days after the happening of the event on which the complaint is based.

27

## FIRST CLAIM FOR RELIEF
## 42 U.S.C. § 1983
### (Against All Defendants)

115.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully
set forth herein.

116.    By failing to provide Mr. Maldonado with adequate medical care and/or
exhibiting deliberate indifference to his rights by not acting on information indicating that
unconstitutional actions were occurring while he was in the custody of the City of New York,
Defendants Flores, Wachtel, Sabbagh, Walker, Devivo, Anim, Richard, Brown, Kumar,
Maungoo, Ashitey, Shaaban, and Huffstead have deprived Mr. Maldonado of rights, privileges,
and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C.
§ 1983, including but not limited to rights guaranteed by the Eighth and Fourteenth Amendments
of the United States Constitution. At all times, these Defendants acted under pretense and color
of state law and within the scope of their respective employment as providers of medical care to
inmates in the custody of the City of New York. These Defendants acted willfully, wantonly,
maliciously, and/or with such reckless disregard of consequences as to reveal a conscious
indifference to the clear risk of serious injury to Mr. Maldonado that shocks the conscience. As
a direct and proximate result of these violations of Mr. Maldonado's constitutional rights, he
suffered damages as alleged above.

117.    Defendant Corizon and Defendant Huffstead knew and/or must have known that
the pattern of abuse and neglect of inmates with chronic conditions and serious medical needs
described above, committed by employees of Defendant Corizon acting under the pretense and
color of law, existed at Rikers Island medical units prior to and during the time of
Mr. Maldonado's mistreatment. Their tolerance of and failure to take measures to curb this
pattern of abuse and neglect, including by ensuring proper training and supervision, constituted

28

acquiescence in the known unlawful behavior of their subordinates and deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Maldonado. Their widespread tolerance of and failure to take measures against this conduct constituted municipal and corporate policy, practice and custom, and was a substantial factor in the continuation of such abuse and neglect and a proximate cause of the constitutional violations alleged in this complaint and of Mr. Maldonado's resultant damages, as alleged above. By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom pursuant to which Mr. Maldonado and others were deprived of adequate medical care, Defendant Corizon and Defendant Huffstead have deprived Mr. Maldonado of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

118.    As a direct and proximate result of the misconduct and abuses of authority detailed above, Plaintiff sustained the damages alleged herein.

## SECOND CLAIM FOR RELIEF
### Medical Malpractice
### (Against All Defendants Except Defendant Huffstead)

119.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

120.    From the time Mr. Maldonado came into the custody of the City of New York through December 31, 2015, Defendant Corizon undertook to provide medical care to inmates in the City's custody at Rikers Island and was legally obligated and had a special duty to do so effectively.

121.    At all times relevant hereto, Defendants Flores, Wachtel, Sabbagh, Walker, Devivo, Anim, Richard, Brown, Kumar, Maungoo, Ashitey, and Shaaban (the "Medical

Defendants") undertook to provide medical care to inmates in the City's custody at Rikers Island and were legally obligated and had a special duty to do so effectively.

122. Defendant Corizon and the Medical Defendants held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and that they undertook to use reasonable care and diligence in the care and treatment of Rikers Island inmates, including Mr. Maldonado.

123. Defendant Corizon and the Medical Defendants were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against Mr. Maldonado.

124. Defendant Corizon, as employer of the Medical Defendants, is responsible for their negligence and wrongdoing under the doctrine of *respondeat superior*.

125. As a result of the medical malpractice, negligence, carelessness, and unskillfulness of Defendant Corizon and the Medical Defendants, Mr. Maldonado sustained damages as described above.

126. A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed hereto.

### THIRD CLAIM FOR RELIEF
### Negligence
### (Against All Defendants)

127. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

128. Defendants owed a duty of care to Mr. Maldonado as an inmate at Rikers Island.

129. Defendants breached the duty of care that they owed to Mr. Maldonado by failing to ensure that he had timely access to medical clinics and appointments with specialists, and by

failing to ensure that he was timely provided with medication recommended by specialists, and/or by otherwise neglecting his medical needs.

130.    Defendants' breach of their duty of care was the proximate cause of Mr. Maldonado's serious and unnecessary injuries, including severe pain, suffering, and interference with normal activities of daily life.

131.    Defendant Corizon, as employer of the remaining Defendants through at least December 31, 2015, is responsible for their negligence under the doctrine of *respondeat superior*.

132.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages alleged above.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff respectfully requests judgment against defendants as follows:

133.    awarding compensatory damages in an amount to be determined at trial;

134.    awarding punitive damages against the Defendants in an amount to be determined at trial;

135.    awarding plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

136.    directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated: September 19, 2016

Respectfully submitted,

Mauricio A. España
John D. Biancamano
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
mauricio.espana@dechert.com
john.biancamano@dechert.com
Ph:  (212) 698-3500
Fax:  (212) 698-3599

*Attorneys for Plaintiff Ysmael Maldonado*

32

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Ysmael Maldonado,

*Plaintiff*,

v.

Corizon Health, Inc., Ruel Huffstead,
Dr. Frank Flores, Dr. Peter Wachtel, Dr. Raja
Sabbagh, Curt Walker, Lynn Devivo, Rose
Anim, Dr. Jean Richard, Ida Brown, Dr. Asha
Kumar, Dr. Maung Maungoo, Daniel Ashitey,
and Dr. Morsi Shaaban,

*Defendants*.

No. 15-cv-6619-PKC-LB

**CERTIFICATE OF MERIT**
**PURSUANT TO C.P.L.R. 3012-a(a)(1)**

I, John Biancamano, an attorney duly admitted to practice before the courts of the State
of New York and the United States District Court of the Eastern District of New York, hereby
certify the following pursuant to 28 U.S.C. § 1746 and N.Y. C.P.L.R. 3012-a(a)(1):

1.	I have reviewed the facts of this case, specifically through numerous interviews
with the Plaintiff, Ysmael Maldonado, and a review of his medical records.

2.	I have consulted with a physician who is licensed to practice in this state and who
is knowledgeable on the issues involved in this case.

1

3.    I have concluded on the basis of my interviews of Mr. Maldonado and review of his medical records, and my consultations with the aforementioned physician, that there is a reasonable basis for the commencement of this action.

4.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 19, 2016

_____
John D. Biancamano
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
john.biancamano@dechert.com
Ph:    (212) 698-3500
Fax:   (212) 698-3599

*Attorney for Plaintiff Ysmael Maldonado*